# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TAHARA RAMSEY,<br><br>       Plaintiff,<br><br>       v.<br><br>ERNEST MONIZ,<br>*Secretary of Energy*,<br><br>       Defendant. | Civil Action No. 12-1035 (BAH)<br><br>Judge Beryl A. Howell |

## MEMORANDUM OPINION

The plaintiff, Tahara Ramsey, filed this employment discrimination action against Steven Chu, in his official capacity as the Secretary of the Department of Energy ("DOE"), after an extended period of conflict between the plaintiff and at least four of her supervisors.[1] The plaintiff alleges both discrete and retaliatory discrimination and a hostile work environment, all in violation the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* Compl. ¶ 1, ECF No. 1. The defendant has moved to dismiss the Complaint or, alternatively, for summary judgment on grounds that the plaintiff failed to exhaust her administrative remedies prior to bringing suit, does not qualify for protection under the Rehabilitation Act, and that no reasonable jury could find discrimination in light of the extra-pleading material submitted. *See* Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J. ("Def.'s Mot."), ECF No. 8; Mem. Supp. of Mot. Summ. J. ("Def.'s Mem."), ECF No. 8. For the reasons stated below, the defendant's motion is granted.

---

[1] Former Secretary of Energy, Steven Chu, was named as the original defendant in this case. Pursuant to Federal Rule of Civil Procedure 25(d), the Court automatically substitutes his successor, Secretary Ernest Moniz, as the new defendant.

## I.    BACKGROUND

### A.    Factual History

The plaintiff suffers from depression and anxiety.  Compl. ¶ 4; Def.'s Statement of Mat.

Facts ("Def.'s SMF") at ¶ 7, ECF No. 8-1.  Since 2005, she has worked as a budget analyst for

the DOE.  Compl. ¶ 4.  Throughout her employment, the plaintiff clashed with numerous

supervisors, although, based upon affidavits submitted by the plaintiff from two of her

colleagues, she was not the only unhappy employee in her office.  *See* Aff. of Tahara Ramsey

("Pl.'s Aff."), DOE Report of Investigation ("ROI"), Ex. 6 at 5, ECF No. 9-1 ("The whole office

was in an uproar by April 2009 with grievances being filed by nearly three [quarters] of the

staff.");  Aff. of Sonya Rush ("Rush Aff."), ROI Ex. 12 at 2 ("Ms. Kupferer knew that none of us

was happy with her, and multiple people were filing grievances."); Aff. of Harry Jacobs ("Jacobs

Aff."), ROI Ex. 11 at 1-2, ("I know we had previous management issues . . . and they had some

very unpractical [*sic*] management practices. . . . I had to file a grievance toward both of them in

response to a harassing email from Ms. Smith's husband. . . . Ms. Kupferer and Ms. Smith . . .

were nasty, hostile and unprofessional people.").  Given the myriad complaints made by the

plaintiff about her treatment at DOE over the course of almost five years, the incidents she

describes are summarized below by the year of their alleged occurrence.

### 1. 2007–2008 Alleged Incidents

In late 2007, the plaintiff's depression worsened and she "experienced a significant

increase in the intensity of her disability," causing her to miss time at work.  Compl. ¶ 7.  On

January 2, 2008, she "requested three hours of advanced sick leave" from her supervisor, Toni

Smith; this request was denied.  Compl. ¶ 9; *see also* Formal Compl. of Discrimination ("First

EEO Compl."), ROI Ex. 3 at 5.  Nevertheless, on January 3, 2008, the plaintiff informed her

supervisor that she would be "out of the office and under a doctor's care for the next two weeks."

First EEO Compl. at 9.  As a result of "DOE Order 322.1 A (8)," Ms. Smith requested that the plaintiff provide specific medical documentation from her treating physician in order to approve her leave, which documentation was required to include:

> 1) a clear and understandable diagnosis of [the plaintiff's] condition[;] 2) the prognosis for [her] return to work, including a statement indicating the nature and duration of any long-term impairment that may affect the performance of [her] duties; and 3) an explanation of the impact of [her] condition on overall health and activities, including the bases for the conclusion stated that restrictions are or are not warranted.

*Id.*  Ms. Smith also provided the plaintiff with a "medical release form" that would "allow a confidential exchange/discussion between the agency's physician or practiner and [her] physician" and informed the plaintiff that she would be placed on Absent Without Leave (AWOL) status until she submitted the requisite medical documentation.  *Id.*  The plaintiff claims that she was "unaware of the unreasonableness of the request" and was intimidated by Ms. Smith's "coercion" and "threats to continue her in AWOL status."  Compl. ¶ 10–12. Nevertheless, in compliance with the request, on January 15, 2008, the plaintiff provided email documentation from her doctor to Ms. Smith containing the specific answers to this supervisor's questions.  *See* Pl.'s Aff. at 19.  Two days after receiving the requested medical information, Ms. Smith approved the plaintiff's request for advanced sick leave for the entire two-week period. *See id.* at 19.

Upon returning to work, the plaintiff noticed security guards regularly patrolling the office corridors.  *See id.* at 3.  The plaintiff alleges that these security guards were present because Ms. Smith, among others, had "submitted a complaint to security stating that they were afraid of [the plaintiff] . . . and [that she] was a mental patient who suffered from depression and could be volatile."  *Id.*  Later in May 2008, the plaintiff became so concerned about her work

environment that she called a nurse at Kaiser Permanente to discuss her situation. Decl. of Tahara Ramsey ("Pl.'s Decl."), at ¶ 25, ECF No. 14-3; Compl. ¶ 13. According to the plaintiff, the nurse asked her whether she "was going to hurt [her] supervisor" to which the plaintiff responded "No . . . I just do not want to encounter them . . . because they [are] causing me a lot of hurt." Pl.'s Aff. at 4. The plaintiff provided the nurse with Ms. Smith's, and others, phone numbers "in the hopes that [the nurse] could get them to understand [her] fragile state, and hopefully allow [her] to go home for the day." *Id.* Neither parties dispute that the nurse subsequently contacted the plaintiff's superiors. The plaintiff did not participate in the telephone conversation but avers that "the medical call for help was twisted" and that her supervisor "lied about the nurse's message." Compl. ¶ 15. According to the defendant, the nurse's message was clear: The plaintiff threatened Ms. Smith with bodily harm. *See* Aff. of Florence Kupferer ("Kupferer Aff."), ROI Ex. 9 at 2; *see also* Compl. ¶ 15.

Following the nurse's call, security guards escorted the plaintiff from the building. She was placed on paid administrative leave for months to allow for an investigation. *See* Def.'s SMF ¶¶ 5–6; Compl. ¶ 16. At the conclusion of the investigation, the plaintiff was suspended for thirty days without pay and a record of the incident was placed in her administrative file. *See* Compl. ¶ 17; Pl.'s Aff. at 5. The plaintiff returned to work in December 2008. During this period, at least one of the plaintiff's co-workers felt that Ms. Smith and Ms. Kupferer "would deliberately do things that caused [the plaintiff] difficulties" and that they would "taunt [the plaintiff] because of her emotional responses," but that the supervisors in general "intentionally did things to their employees to make it difficult . . . ." Rush Aff. at 1–2.

### *2. 2010 Alleged Incidents*

In 2010, the plaintiff began working for a new supervisor, Lametia Browne, the new

Deputy Director.[2]  Compl. ¶ 21.  The plaintiff believes that Ms. Browne was hired as part of a

"vendetta" against the office staff.  Pl.'s Aff. at 6.  She further alleges that Ms. Browne

previously "directed Ms. Smith" in requesting [the plaintiff's] medical information and that Ms.

Browne "is the culprit and has been behind all of the occurrences that have happened to [her]."

*Id.* at 8.

On March 16, 2010, the plaintiff slipped and fell at work.  The plaintiff requested from

Ms. Browne "the information that [she] needed to fill out workers compensation." *Id.* at 7. A few

weeks later, the plaintiff emailed Ms. Browne noting that she "was not [supposed] to be charged

any leave for the incident" and asking "when the issue with [her] leave will be resolved." *Id*. at

14.  The next day, Ms. Browne responded that the plaintiff "need[ed] to submit [her] CA-1 form

. . . for completion" and that, once the appropriate documentation was submitted, Ms. Browne

would instruct the timekeeper to replace the plaintiff's sick leave with continuation of pay leave.

*Id.* at 13.  The Office of Worker's Compensation Procedures guide states that CA-1 (Traumatic

Injury) claims are "[i]nitiated by the employee," who is responsible for completing the CA-1 and

filing it with a supervisor.  *Id.* at 15.  The supervisor's responsibility is to "[r]eview the CA-1 for

completeness and accuracy" and to "[a]ssist the employee in correcting any deficiencies found."

*Id.*  Although the plaintiff originally took "sick leave" following her fall, Ms. Browne noted that

once the plaintiff's "Workers' Compensation claim [was] approved," Ms. Brown would

coordinate with the plaintiff's "timekeeper [to] minus sick and add continuation of pay . . . for

---

[2] Ms. Browne became Acting Deputy Director of the Office of Resource Management ("ORM") in January 2010 and the Deputy Director in April 2010, during which period she was supervised the plaintiff.  Compl. ¶ 21; Aff. of Lemetia D. Browne ("Browne Aff."), ROI Ex. 7 at 1.

March 17, 18, and 19." *Id.* at 13. Despite these instructions, the plaintiff states that Ms. Browne "refused to provide any guidance for [her] to follow" and that Ms. Browne "did not tell [her] how to get [her] leave back." *Id.* at 7.

In early May 2010, the plaintiff was summoned and selected for jury duty for a period of five days. *Id.* at 6, 11. Following the conclusion of her jury duty, the plaintiff informed Ms. Browne that she needed to repair her air conditioner and would therefore be absent from work for an additional day. *Id.* Ms. Browne responded that "ideally [the plaintiff] should have reported [to ORM] for duty once [her] commitment to jury duty was over," and that "[the plaintiff] must identify the type of leave [requested]." *Id.* at 11. Ms. Browne added that she would approve the leave requests "[u]pon receipt of [the plaintiff's] leave requests." *Id.* Ms. Browne also noted that the plaintiff should "submit . . . the original court documentation [she] would have received following [her] jury service." *Id.* The record does not indicate whether the plaintiff filed the appropriate paperwork as her supervisor requested, or whether the plaintiff's request for an additional day of leave following her jury duty was granted.

On May 14, 2010, the plaintiff requested advanced sick under the Family Medical Leave Act ("FMLA") in order to care for her son following a scheduled surgery. Browne Aff. at 2; Pl.'s Aff. at 7. According to Ms. Browne, the plaintiff stated that she did not want to provide the requisite medical documentation directly to her supervisors, because it contained her son's personal medical information. Browne Aff. at 2. Consequently, Ms. Browne gave the plaintiff the option of submitting the required documentation to the Office of Employee and Labor Relations. *See* ROI Ex. 15; Def.'s SMF ¶ 26. By May 20, 2010, the plaintiff's request was approved. Def.'s SMF ¶ 28; Browne Aff. at 3.

While pursuing FMLA leave to care for her son, the plaintiff sought to enroll in the DOE "Flexiplace" program, which would allow her to work from home in certain circumstances. *See* ROI Ex. 18 at 1. Flexiplace "covers employees who work at sites other than their official workplace." Handbook on DOE-Flex, ("Flexiplace Handbook"), ROI Ex. 19 at 1. One Flexiplace arrangement is designed "to accommodate employees for their medical issues," *id*. at 4, which includes "car[ing] for a family member . . . who requires care or assistance," Flexiplace Handbook at 6. To qualify, an employee must "provide a plan whereby he/she will ensure that there is no disruption to the performance of work task, and that there is medical documentation to justify the medical flexiplace." *Id*. at 7. On May 21, 2010, the plaintiff "placed the completed copy [of her Flexiplace application] in [Ms. Browne's] inbox." Pl.'s Aff. at 7. Two weeks later, the plaintiff followed-up with Ms. Browne regarding the status of her medical Flexiplace application. *Id*. at 9. A month later, the plaintiff requested an update on her Flexiplace application. Ms. Browne informed her that her application was incomplete and required more supporting medical documentation. *Id*. at 25; Browne Aff. at 3. The application also lacked "a plan . . . that would address any dependent care issues as outlined by the Office of Policy and International Affairs' Handbook for Flexiplace." Browne Aff. at 3. Ms. Browne has not approved medical Flexiplace arrangements for any of her supervised employees. Browne Aff. at 3.

In August 2010, the plaintiff returned to work on crutches after breaking her ankle. Nevertheless, according to the plaintiff, Ms. Browne "failed to remove multiple carts from in front of [her] office door." Pl.'s Aff. at 7.

Later in August 2010, Todd Dixon, the Director of ORM and the supervisor of both the plaintiff and Ms. Browne, instructed the plaintiff not to use the phones. March 25, 2011 EEO Compl. ("Second EEO Compl.") at 10, ECF No. 21-2. [3]

In October 2010, Mr. Dixon called the plaintiff unprofessional during a closed door meeting and cautioned the plaintiff regarding her use of the telephone. Second EEO Compl. at 10.

In November 2010, the plaintiff received a work evaluation of "meets expectations," which was the "lowest performance appraisal" within her division. *Id.*; *see also* Non-Supervisory Performance Plan and Appraisal Form, ROI Ex. 16.

On December 3, 2010, Mr. Dixon "interrogat[ed]" the plaintiff during a "closed door meeting" regarding the amount of work being done by the plaintiff and whether it was commensurate with her GS-13 grade level. Second EEO Complaint at 9.

Less than a week later, on December 8, 2010, Ms. Browne refused to provide the plaintiff "with important information" about her work assignment and Mr. Dixon was "disrespectful and rude" to the plaintiff. *Id.* at 8.

On December 9, 2010, Ms. Browne "targeted and counseled" the plaintiff on her leave usage. *Id.* at 8.

On December 15, 2010, Mr. Dixon sent the plaintiff "hostile and intimidating work related emails . . . [regarding] the FY 2012 budget analysis." *Id.* at 6–7.

---

[3] Todd Dixon became the Director of the ORM in April 2010. *See* Aff. of Todd Dixon ("Dixon Aff."), ROI Ex. 8 at 1.

### *3. 2011 Alleged Incidents*

On January 20, 2011, Ms. Browne denied the plaintiff's request for administrative leave and also denied the plaintiff's request for a union representative during a meeting that the plaintiff considered to be disciplinary in nature.  *Id.* at 5–6.

On January 25, 2011, Mr. Dixon ordered the plaintiff to "hand walk hard copies of the Congressional Report" to the four Deputy Assistance Secretaries and be more "subservient to the higher up managers." *Id.* at 6.

On January 26, 2011, Ms. Browne denied the plaintiff's request for annual leave and again, on February 1, 2011, denied the plaintiff's request for thirty minutes of Leave Without Pay.  *Id.* at 5.

On February 11, 2011, the plaintiff met with DOE's alternative dispute resolution counselor, who encouraged her to drop her EEO case and to mediate with her managers instead. *Id.* at 4.  The plaintiff refused to drop her EEO case and two hours later received an invitation to a February 15, 2011 meeting, at which she "was placed on Leave Restriction" by Ms. Browne due to her tardiness in January 2011.  *Id.* at 4–5.

 On March 18, 2011, Mr. Dixon approached the plaintiff "abruptly" and "aggressively." *Id.* at 3.

Finally, on March 21, 2011, Mr. Dixon issued the plaintiff a Letter of Reprimand for making "false email statements."  *Id.* at 3, 16–18.

### B.    Procedural History

The plaintiff first contacted an EEO Counselor on May 7, 2010 and filed her first formal Complaint of Discrimination on July 2, 2010.  *See* ROI, Ex. 2.  In the First EEO Complaint, the plaintiff requested that Ms. Browne "be removed as [her] direct supervisor" and that she be directly supervised by Mr. Dixon.  First EEO Compl. at 1–4.  The EEO notified the plaintiff on

July 23, 2010, that her complaint had been accepted as to only two issues: whether she was "discriminated against when [her] supervisor: (1) questioned/harassed [her] about [her] use of the [FMLA]; and (2) denied [her] request to work from home." Notice of Acceptance/Dismissal of Formal Compl. of Discrimination, ROI Ex. 5 at 1. After the filing of the First EEO Complaint, the plaintiff continued to feel aggrieved by her treatment at work between August 2010 and March 2011 and she filed a Second EEO Complaint on March 25, 2011. *See* Second EEO Compl. at 1. The Second EEO Complaint alleged that she was subject to a hostile work environment and retaliation in response to her first EEO Complaint.

After the plaintiff submitted her First EEO Complaint, the DOE initiated an investigation, which started on September 23, 2010 and concluded on December 13, 2010. Authority to Investigate, ROI Ex. 1 at 1–2. This First EEO Complaint was consolidated with the Second EEO Complaint, and, on Nov. 25, 2011, the plaintiff requested an administrative hearing on both complaints. *See* Def.'s Reply to Pl.'s Suppl. Mem. ("Def.'s Supp. Reply") Ex. C at 1–2, ECF No. 21-3. After numerous discovery requests and stays beginning in January 2012, the plaintiff opted to forgo an administrative hearing and proceed directly to federal court. She filed her Complaint in this Court on June 22, 2012, 722 days after her First EEOC Complaint and 456 days after her Second EEOC Complaint. *See generally* Def.'s Supp. Reply, Exs. E-O; Compl. The plaintiff's administrative hearing was dismissed because the plaintiff filed the instant action.[4] *See* Order of Dismissal Following Filing in Federal Ct., Def.'s Supp. Reply, Ex. Q.

---

[4] After filing the current civil action, the plaintiff filed an additional EEO Complaint, which is not considered here. *See* Pl.'s Decl. at ¶¶ 85–87.

## II.    LEGAL STANDARD

### A.    Conversion to Motion for Summary Judgment

The DOE has moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), for dismissal, or, alternatively, for summary judgment, pursuant to Federal Rule of Civil Procedure 56 on all of the plaintiff's claims. *See* Def.'s Mot. Federal Rules of Civil Procedure 12(d) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment," and if a motion is so converted, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d).

The Circuit reviews a district court's decision to convert a motion to dismiss into a summary judgment motion for an abuse of discretion. *Colbert v. Potter*, 471 F.3d 158, 164–65 (D.C. Cir. 2006); *Flynn v. Tiede–Zoeller, Inc.*, 412 F. Supp. 2d 46, 50 (D.D.C. 2006) ("The decision to convert a motion to dismiss into a motion for summary judgment . . . is committed to the sound discretion of the trial court."). In using this discretion, "the reviewing court must assure itself that summary judgment treatment would be fair to both parties." *Tele-Commc'ns of Key W., Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985). Therefore, "[i]n converting the motion, district courts must provide the parties with notice and an opportunity to present evidence in support of their respective positions." *Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011). When the defendant expressly moves for summary judgment in the alternative to a motion to dismiss before discovery has been conducted, and relies upon extra-pleading material, to which the plaintiff has an opportunity to respond, the Court need not issue separate prior notice of the conversion. *See Colbert*, 471 F.3d at 168; *see also Mount v. Johnson*, No. 12-cv-1276, 2014 U.S. Dist. LEXIS 49613, at *20 (D.D.C. Apr. 10, 2014); *Pintro v. Wheeler*, No. 13-

cv-0231, 2014 U.S. Dist. LEXIS 45092, at *13 n.5 (D.D.C. Apr. 2, 2014) (finding prior notice of conversion unnecessary "where the plaintiff is represented by counsel and has responded to the submission of exhibits with evidence of her own."); *Hamilton v. Geithner*, 743 F. Supp. 2d 1, 8 (D.D.C. 2010) (Walton, J.), *aff'd*, 666 F.3d 1344 (D.C. Cir. 2012).

If extra-pleading evidence "is comprehensive and will enable a rational determination of a summary judgment motion," a district court will be more likely to convert to summary judgment, but "when it is scanty, incomplete, or inconclusive," the district court is more likely to decline to convert to summary judgment and permit further discovery. *See* 5C Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2012). Thus, there is no bright-line threshold for conversion under Rule 12(d); the touchstone is fairness and whether consideration of summary judgment is appropriate, in light of the nature of the extra-pleading material submitted, the parties' access to sources of proof, the parties' concomitant opportunity to present evidence in support or opposition to summary judgment and the non-moving party's need, as reflected in a sufficiently particularized request, under Federal Rule of Civil Procedure 56(d), for discovery in order to respond adequately.  Consideration of these factors, including that both parties submitted exhibits in support and opposition to the alternative motion for summary judgment and neither party has requested an opportunity for additional discovery before resolving this motion, the Court will consider matters beyond the pleadings and treat the defendant's motion as one for summary judgment.[5]

---

[5] Indeed, the plaintiff was granted four extensions of time to respond to the defendant's motion in order to "to take statements from witnesses," Motion for Extension of Time in Which to File Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 10, and "complete all of the documents necessary for the opposition, which includes exhibits, responses to Defendant's factual statements, declarations from witnesses, a rule 56(d), Fed. R. Civ. P. declaration and the opposition itself," Motion for Extension of Time in Which to File Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 12.

### B. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (same). The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Celotex*, 477 U.S. at 323; *Hendricks v. Geithner*, 568 F.3d 1008, 1012 (D.C. Cir. 2009). "Material facts are those that might affect the outcome of the suit under governing law; genuine issues are those in which the evidence before the court is such that a reasonable trier of fact could find for the moving party." *Hendricks*, 568 F.3d at 1012; *see also Holcomb v. Powell*, 433 F.3d 880, 895 (D.C. Cir. 2006) ("A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." (citing *Anderson v. Liberty Lobby, Inc.* (*Liberty Lobby*), 477 U.S. 242, 248 (1986))).

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party and shall accept the nonmoving party's evidence as true. *Liberty Lobby*, 477 U.S. at 255; *see also Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3). The nonmoving party must establish more than "[t]he mere existence of a scintilla

of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on mere allegations or conclusory statements, *see Ass'n of Flight Attendants v. United States Dep't of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009); *Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C. Cir. 2006); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *accord* FED. R. CIV. P. 56(e). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *See, e.g.*, FED. R. CIV. P. 56(c)(1); *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (noting that at summary judgment stage, plaintiff "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true.'" (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002) (ellipsis and second alteration in original))). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

## III.    DISCUSSION

The plaintiff's complaint asserts two broad claims: First, that the defendant subjected her to adverse employment actions based on her disability and in retaliation for her participation in protected activity, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.,* Compl. ¶ 1; and, second, that she was subject to a hostile work environment, also in violation of the Rehabilitation Act. *Id.* Before reaching the merits of the plaintiff's claims for disability discrimination, retaliation, and hostile work environment, the Court must consider the defendant's threshold challenge to the plaintiff's claims: Whether the plaintiff exhausted her administrative remedies as required by the Rehabilitation Act, 29 U.S.C. § 794a.

## A.    Exhaustion of Administrative Remedies

Under the Rehabilitation Act, a failure to exhaust administrative remedies is a jurisdictional defect, requiring dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1).  *See Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006).  Since exhaustion of Rehabilitation Act claims "is a jurisdictional requirement," the plaintiff has the burden to plead and prove it.  *Carty v. Dist. of Columbia*, 699 F. Supp. 2d 1, 2 n.2 (D.D.C. 2010) (citation omitted).  The defendant contends that the plaintiff abandoned the administrative process prior to its conclusion and thereby failed to exhaust her administrative remedies. *See* Def.'s Mem. at 13–16.  The Court will first examine the procedural requirements for exhaustion before turning to the specific facts pertinent to the plaintiff's participation in, and exhaustion of, the administrative process.

### 1. Overview of Administrative Process

The procedures governing administrative processing of discrimination complaints brought by employees of the federal government under the Age Discrimination in Employment Act, Title VII, and the Rehabilitation Act are set forth in 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity).  *See* 29 C.F.R. § 1614.105.  An employee "must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter." *Id.* § 1614.105(a).  "An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory . . . ." *Id.* § 1614.105(a)(1).  If the matter is not resolved through informal counseling, the aggrieved employee must, within 15 days, file a written complaint with the agency that allegedly discriminated against him or her.  *See id.* § 1614.106(a)–(c).  The agency must investigate the matter within 180 days or reject the complaint and issue a final dismissal unless the parties agree in writing to extend the investigation period. *See id.* §§ 1614.106(e)(2), 1614.107.  At the conclusion of the agency's investigation, the

complainant may request a hearing before an EEOC administrative judge or an immediate final decision by the agency. *See id.* § 1614.108(f).[6]

Following the conclusion of the agency's investigation, a complainant may file a civil action if the complaint has been pending before the agency or the EEOC for at least 180 days. *See* 42 U.S.C. § 2000e–16(c); 29 C.F.R. § 1614.407. Specifically, the statute provides that "after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit . . . , an employee . . . , if aggrieved . . . by the failure to take final action on his complaint, may file a civil action . . . ." 42 U.S.C.A. § 2000e-16(c); *see* 29 U.S.C. § 794a(a)(1). The implementing regulation provides that a "complainant who has filed an individual complaint . . . is authorized under title VII, the ADEA and the Rehabilitation Act to file a civil action in an appropriate United States District Court . . . (b) After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and final action has not been taken . . . ." 29 C.F.R. § 1614.407.

### 2. The Plaintiff's Voluntary Withdrawal from the Administrative Process Does Not Amount to a Failure to Exhaust

The defendant contends that although the plaintiff filed this action in federal court after the passage of 180 days, she nevertheless failed to exhaust her administrative remedies by voluntarily withdrawing from her requested administrative hearing. Def.'s Mem. at 7–8, 13. The defendant is correct that a plaintiff does not have an absolute right to file a claim in Federal court after the passage of 180 days from the filing of an EEO complaint. Indeed, "[a] plaintiff's suit 'will be barred for failure to exhaust administrative remedies' if he 'forces an agency to dismiss or cancel the complaint by failing to provide sufficient information to enable the agency to

---

[6] A complainant who receives an adverse final decision from the agency may appeal that decision to the EEOC within 30 days, or may file a civil action within 90 days. *See* 42 U.S.C. § 2000e–16(c); 29 C.F.R. §§ 1614.402(a)– 1614.407; *see also Wilson v. Peña,* 79 F.3d 154, 157 (D.C. Cir. 1996); *Holley v. Dep't of Veterans Affairs,* 165 F.3d 244, 245–46 (3d Cir. 1999).

investigate the claim.'" *Koch v. White*, 744 F.3d 162, 165 (D.C. Cir. 2014) (quoting *Wilson v. Peña*, 79 F.3d 154, 164 (D.C. Cir. 1996)).  In *Rann v. Chao*, the D.C. Circuit considered whether a plaintiff could bring suit in district court after the passage of 180 days from filing an EEO complaint, when the plaintiff failed to cooperate during the initial 180 days.  346 F.3d 192, 195 (D.C. Cir. 2003).  The Court rejected the plaintiff's argument that "his claim had been 'perfected' by the running of 180 days from his formal . . . complaint with the . . . EEO office," and reasoned that, where "the agency acted early and often on the [plaintiff's] complaint," the plaintiff could not "turn his own obduracy into a basis for penalizing the agency."  *Id.* at 197.

In *Wilson v. Peña*, however, the D.C. Circuit stated that "[o]nce a complainant files a complaint or appeal and cooperates with the agency or EEOC for 180 days, he is not required to take any further action to exhaust his administrative remedies."  79 F.3d 154, 166 (D.C. Cir. 1996).  The Court explained that "[t]he 180 day provision represents a Congressional determination that providing prompt access to the courts in discrimination disputes is so important that the administrative process will be given only a finite time to deal alone with a given dispute."  *Id.* at 167 (quoting *Grubbs v. Butz*, 514 F.2d 1323, 1328 (D.C. Cir. 1975)).  Nevertheless, the Court cautioned that "[i]f a complainant forces an agency to dismiss or cancel the complaint by failing to provide sufficient information to enable the agency to investigate the claim, he may not file a judicial suit."  79 F.3d at 164.  Courts within this district are split on whether a plaintiff's voluntary dismissal of an EEO complaint after having requested and pursued an administrative hearing but after the 180 day time period has lapsed, warrants a dismissal for failure to exhaust administrative remedies.[7]

---

[7] *See Johnson v. Donahoe*, No. 10-386, 2011 WL 4430885, at *5 n.3 (D. Neb. Sept. 22, 2011) (recognizing that within the District Court for the District of Columbia, "there is an intra-district disagreement whether the withdrawal of a request for hearing impacts the exhaustion of remedies").  The guidance from other circuits is likewise mixed. In *Martinez v. Dep't of the Army*, 317 F.3d 511, 514 (5th Cir. 2003), the court held that a "withdrawal of [the

For example, in *Brown v. Tomlinson*, 462 F. Supp. 2d 16, 20 (2006), the court recognized

that the plaintiff "failed to meet virtually every discovery deadline" with respect to an

administrative hearing and that when the plaintiff provided discovery responses, they were "only

incomplete." The plaintiff subsequently withdrew from the administrative proceeding and filed a

complaint in Federal court. Despite the plaintiff's voluntary dismissal of, and failure to

cooperate in, the administrative proceedings, the court permitted the Federal suit. *Id. Brown*

held that a complaint could only be dismissed for failure to exhaust if a plaintiff's non-

cooperation during the administrative proceedings fails "to provide sufficient information to

enable the agency to *investigate* the claim." *Id.* at 21 (emphasis added) (quoting *Wilson*, 79 F.3d

at 164)). Importantly, in *Brown*, the plaintiff's non-cooperation began only after both the

original investigation had been completed and after 180 days had passed from filing of the

complaint. *Id.* at 18, 21. Likewise, in *Augustus v. Locke*, 699 F. Supp. 2d 65, 71 (D.D.C. 2010),

the court determined that "[w]hile a complainant may elect to allow an administrative hearing to

run its full course, there is no statute or regulation requiring a plaintiff to complete the

administrative hearing process if more than 180 days has passed without a final determination by

the agency . . . ." The *Locke* court determined that it had "no reason . . . to stray from *Brown*"

because the decision was "both well-reasoned and consistent with Circuit authority." *Id.* at 72;

---

plaintiff's] request for an EEOC hearing is not un-cooperative for purposes of the failure-to-exhaust inquiry . . . ."
*see also Laudadio v. Johanns*, 677 F. Supp. 2d 590, 602 (E.D.N.Y. 2010) ("Where, as here, a case languishes in the
administrative phase for long beyond 180 days . . . we cannot say that abandoning the administrative process
constitutes such a lack of cooperation as to bar suit by reason of failure to exhaust administrative remedies." (citing
*Munoz v. Aldridge*, 894 F.2d 1489, 1493 (5th Cir. 1990)). In *Laughter v. Gallup Indian Med. Ctr.*, 425 Fed. App'x
683, 686 (10th Cir. 2011), however, the court held, over a spirited dissent, that "[a]bandoning a complaint of
discrimination filed with an employing agency prior to the agency's final action on the complaint constitutes a
failure to exhaust." *See also Smeltzer v. Potter*, No. 10-cv-00178, 2010 WL 4818542, at *3 (W.D.N.C. Nov. 22,
2010) ("When a plaintiff waives or abandons a claim at the administrative level, the plaintiff effectively fails to
exhaust the claims to permit district court review."); *Stephens-Buie v. Shinseki*, No. 09-cv-2397, 2011 WL 2574396,
at *8 (S.D.N.Y. June 27, 2011) ("When a plaintiff voluntarily withdraws a timely filed claim during the EEO
process, 'by withdrawing his claim he effectively fail[s] to exhaust his remedies.'" (quoting *Brown v. City of New
York*, 869 F.Supp. 158, 170 (S.D.N.Y.1994))).

*see also Payne v. Locke,* 766 F. Supp. 2d 245, 250 (D.D.C. 2011); *Abdelkarim v. Tomilinson*, 605 F. Supp. 2d 116, 120 (D.D.C. 2009).

The principal justification for permitting suit following the abandonment of the administrative process in these cases is the plain language of the statute. *See, e.g.*, *Payne*, 766 F. Supp. 2d at 250–51 (holding that "the plain language of 42 U.S.C. § 2000e-16(c) and 29 C.F.R. § 1614.407 . . . allow [the plaintiff] to proceed because more than 180 days elapsed between the filing of his complaint and his allegedly uncooperative behavior relating to the EEOC hearing.").

Yet, the statutory language is not quite so plain. The statute permits suit after 180 days, only for an employee "*aggrieved* . . . by the failure to take final action on his complaint." 42 U.S.C. § 2000e-16(c) (emphasis added). A party who abandons an administrative proceeding, after formally requesting such a proceeding, is arguably not "aggrieved" by the failure of the agency to take final action. Indeed, the only impediment to the agency's final action was the plaintiff's own decision to abandon the administrative process.

Based upon this alternative reading of the statutory language, other Judges on this Court have viewed the voluntary dismissal of administrative proceedings as fatal to a subsequent lawsuit. For example, in *Smith v. Koplan*, 362 F. Supp. 2d 266, 268 (D.D.C. 2005), after the 180-day window passed, the plaintiff requested a hearing before an EEO administrative law judge. The plaintiff subsequently failed to respond to the defendant's discovery requests and the case was therefore dismissed by the administrative law judge. *Id.* at 267. Although 180-days had passed, the court determined that the "fail[ure] to cooperate" equated to a "fail[ure] to exhaust" administrative remedies. *Id.* at 268. The *Koplan* court explained that the "[p]laintiff abandoned the administrative process when she did not comply with the discovery proceedings before the EEOC administrative judge," warranting dismissal of the federal lawsuit on this

ground.  *Id.*  Likewise, in *Wiley v. Johnson*, 436 F. Supp.2d 91, 93–94 (D.D.C. 2006), the

plaintiff voluntary dismissed his EEO complaint after 180-days had passed and after requesting a

hearing.  The court held that "[a] voluntary dismissal cannot be used to circumvent the

requirement of exhaustion," and dismissed the lawsuit.  *Id.* at 95; *see also Pearsall v. Holder*,

610 F. Supp. 2d 87 (D.D.C. 2009) (dismissing claims that were asserted but withdrawn at the

administrative level).[8]

Absent from those cases, and from the parties briefing in this case, is any discussion of

*McRae v. Librarian of Congress*, 843 F.2d 1494 (D.C. Cir. 1988) (per curiam), which controls

the outcome of the present case.  In *McRae*, the plaintiff cooperated in the agency investigatory

process for two years and, as a result, the agency had "a record complete enough to issue an

initial denial of her complaint."  *Id.* at 1496.  Although the statute permitted the plaintiff to seek

immediate judicial relief, "because one hundred eighty days had elapsed since the filing of her

formal complaint," the plaintiff instead requested an administrative hearing.  *Id.*  Due to an

"adverse procedural ruling," the plaintiff withdrew from the administrative hearing and brought

suit in Federal court.  *Id.*  The D.C. Circuit could envision "no reason why [the plaintiff's] good

faith refusal to pursue the hearing should now bar [the plaintiff's] claim," given that under the

statute the plaintiff was entitled to a *de novo* trial in federal court regardless of the agency's

---

[8]In *Bell v. Donley*, 724 F. Supp.2d 1, 13 (D.D.C. 2010), the court rejected the argument that "a plaintiff has an absolute right to withdraw from the administrative process after 180 days and bring suit in federal court."  The *Bell* court cited *Wiley v. Johnson* approvingly for the proposition that "a plaintiff 'cannot use a voluntary dismissal to avoid the requirements of exhaustion, as this would undermine the purposes behind the exhaustion doctrine.'" *Id.* at 13 (quoting *Wiley*, 736 F. Supp. 2d at 95).  Ultimately, however, the court determined that the plaintiffs had taken "action to frustrate the administrative proceedings" within the 180 day window, and therefore did not exhaust her administrative remedies.  *See* 724 F. Supp.2d at 13. (finding that "although [the plaintiff] cooperated with the agency for 180 days as to [the] original complaint, [the plaintiff] did not cooperate with regard to the two amended complaints" and holding that "[u]nder these circumstances . . . [the plaintiff] failed to properly exhaust"); *see also id.* ("[I]t is well-established that failure to cooperate in the investigation will be equated with a failure to exhaust administrative remedies, notwithstanding the passage of the 180-day time period.").  Thus, although the *Bell* court did not address precisely the issue here—a voluntary withdrawal after good-faith cooperation for 180 days—it did signal support for the position taken in *Wiley v. Johnson*.

disposition of her claim.  *Id.* at 1496.  Accordingly, the Court reversed the district court and permitted the plaintiff's claim to proceed.

   *McRae* is on all fours with the instant case.  The plaintiff cooperated with the EEO investigation (resulting in a complete EEO investigation report), requested an administrative hearing, and subsequently withdrew from the administrative hearing following an adverse procedural ruling.[9]  The defendant argues that the plaintiff "did not respond to the Agency's discovery requests and instead sought a stay of the proceedings" and that the plaintiff "delayed the administrative process while she attempted to negotiate settlement."  *See* Def.'s Supp. Reply at 9–10.  Neither requesting a stay of proceedings nor attempting to negotiate a settlement constitutes bad faith by the plaintiff or non-cooperative conduct, however.

   The plaintiff cooperated in the EEO proceedings for more than 180 days and withdrew from her optional administrative hearing in good faith.  Thus, the plaintiff's withdrawal from the administrative process does not amount to a failure to exhaust her administrative remedies.  Accordingly, the defendant's challenge to the entire complaint for failure to exhaust administrative remedies is rejected.

### 3. Only Plaintiff's Timely-Filed EEO Claims Will Be Considered

   A federal employee who believes that she has been the subject of unlawful discrimination "must 'initiate contact' with an EEO Counselor in her agency 'within 45 days of the date of the matter alleged to be discriminatory.'"  *Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008) (quoting 29 C.F.R. § 1614.105(a)(1)); *see also Leiterman v. Johnson*, No. 13-394, 2014 WL 3708040, at *13 (D.D.C. 2014).  The requirement of timely administrative exhaustion applies to each discrete act alleged to be discriminatory, such that "[e]ach discrete discriminatory act starts

---

[9] In response to dilatory discovery, the administrative law judge excluded certain pieces of evidence from the plaintiff's case.  *See* Def.'s Supp. Reply at 4.

a new clock for filing charges alleging that act.'" *Singletary v. Dist. of Columbia*, 351 F.3d 519,

526 (D.C. Cir. 2003) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002));

*see also Raines v. United States Dep't of Justice*, 424 F. Supp. 2d 60, 66–67 (D.D.C. 2006).

The requirement concerning the exhaustion of administrative remedies is less stringent

for hostile work environment claims than for discrete claims of discrimination or retaliation

claims, however. Although, a "plaintiff raising claims of discrete discriminatory or retaliatory

acts must file his charge within the appropriate time," a hostile work environment claim "will not

be time barred so long as all acts which constitute the claim are part of the same unlawful

employment practice and at least one act falls within the time period." *Morgan*, 536 U.S. at 122;

*see also Nurriddin v. Goldin*, 382 F.Supp. 2d 79, 107 n. 10 (D.D.C. 2005) ("Unlike discrete

claims of discrimination and retaliation, the exhaustion requirement on a hostile work

environment claim is less stringent.").

The plaintiff first contacted an EEO counselor on May 7, 2010 and filed her First EEO

complaint on July 2, 2010, alleging numerous discrete acts of discrimination between April 2007

and June 2010. Since a plaintiff is required to contact an EEO counselor within 45 days of an

alleged discriminatory event, only those events occurring on, or after, March 23, 2010 and

included in the plaintiff's First EEO Complaint have been exhausted and can be considered as

part of her discrimination claims in this suit. Thus, the only discrete acts of discrimination that

have been timely exhausted from the plaintiff's First EEO complaint concern whether the

plaintiff's supervisors "(1) questioned/harassed [the plaintiff] about [her] use of the Family

Medical Leave Act (FMLA); and (2) denied [the plaintiff's] request to work from home." *See*

EEO Investigative Report ("EEO Report"), ROI Ex. 5 at 1.

Notably, although the plaintiff now asserts that she was retaliated against for seeking a reasonable accommodation of her disability in May 2010, *see* Pl.'s Opp. at 26–28, the EEO was never placed on notice of this claim when investigating the plaintiff's First EEO Complaint, which contained only allegations of discrete discrimination. *See* EEO Report at 1. "The 'theories of discrimination in [a] plaintiff's lawsuit are limited to the theories contained in the [administrative EEO complaint] he filed.'" *Koch v. Walter*, 935 F. Supp. 2d 164, 174 (D.D.C. 2013) (alterations in original) (quoting *Ponce v. Billington*, 652 F. Supp. 2d 71, 74 (D.D.C. 2009)). The plaintiff raised the issue of retaliation for the first time in her Second EEO Complaint and therefore the retaliatory actions claimed as occurring prior to the July 2, 2010 First EEO Complaint are barred as not timely exhausted.

The plaintiff filed her Second EEO Complaint on March 25, 2011, alleging an "ongoing hostile work environment and discrimination on the bases of retaliation" as a result of sixteen identified incidents, occurring between August 26, 2010 and March 21, 2011, after the filing of her First EEO Complaint. *See* Notice of Acceptance of Compl. of Discrimination, ECF No. 9-4. After a review of the plaintiff's complaint, the agency "accepted for investigation and further processing" all sixteen of the alleged incidents. *Id.* Neither the EEO Complaint nor the Notice of Acceptance of Complaint of Discrimination indicate whether the plaintiff first met with an EEO counselor prior to filing suit, as required by regulation. *See* 29 C.F.R. § 1614.105(a). (requiring an employee to "consult a Counselor prior to filing a complaint in order to try to informally resolve the matter."). Nor does the plaintiff's complaint or declaration indicate that she spoke with an EEO counselor prior to filing her Second EEO Complaint. *See* Compl. ¶ 32 (discussing exhaustion of administrative remedies only as to First EEO Complaint); *see generally* Pl.'s Decl. The only evidence in the record regarding a discussion with an EEO

counsel refers to a February 2011 incident in which the plaintiff spoke with an EEO official regarding alternative dispute resolution as it related to the plaintiff's First EEO Complaint. *See* Second EEO Compl. Yet, it is the plaintiff's burden under the Rehabilitation Act to plead and prove exhaustion. *See Spinelli*, 446 F.3d at 162. Moreover, the Court specifically requested from the parties additional briefing and evidence regarding the topic of exhaustion. *See* August 9, 2013 Minute Order ("[T]he Plaintiff shall supplement the record with all documents to sustain her burden of establishing that she has exhausted her administrative remedies . . . ."). In response to the Court's order, the plaintiff submitted only the First EEO Complaint. *See* Pl.'s Supp. Reply, Ex. 1, ECF No. 20. Accordingly, the plaintiff has failed to meet her burden in establishing that she exhausted the administrative process regarding the Second EEO Complaint, which includes the plaintiff's retaliation and hostile work environment claims and those claims must be dismissed. Even assuming the plaintiff did meet with a counselor and did properly exhaust the administrative process as to the incidents alleged in the Second EEO Complaint, the plaintiff's claims nonetheless fail, as discussed below.

###    B.    The Discrete Discrimination Claim

"Under . . . the Rehabilitation Act, the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's. . . disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (citing 29 U.S.C. §§ 701 *et seq.*; *Breen v. Dep't of Transp.*, 282 F.3d 839, 841 (D.C. Cir. 2002)). Ordinarily, in cases involving only indirect evidence of discrimination, as here, courts apply the *McDonnell Douglass* burden shifting framework to determine whether the adverse employment action was taken "because of" the alleged disability. *See Woodruff v. Peters*, 482 F.3d 521, 528 (D.C. Cir. 2007) ("[W]e apply Title VII's *McDonnell Douglas* burden-shifting framework to retaliation

claims under the Rehabilitation Act . . . ."). The D.C. Circuit has clarified, however, that if the defendant proffers "a legitimate, non-retaliatory justification" for the defendant's actions, then "the burden-shifting framework [falls] away." *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014). All that remains is for the court to determine whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Thus, a court need not determine if the plaintiff has made a *prima facie* showing of discrimination where the plaintiff "has suffered an adverse employment action, and an employer has asserted a legitimate, non-discriminatory reason for the decision." *Id.* at 494–95.

The Court will therefore address whether a genuine issue of material fact exists as to (1) whether the plaintiff is disabled and therefore covered by the protections of the Rehabilitation Act; (2) whether the plaintiff suffered an adverse employment action; and (3) whether a reasonable jury could find that the defendant's proffered non-discriminatory reason was not the actual reason for any adverse employment action; or whether, if there are no genuine issues of material fact, the defendant is entitled to judgment as a matter of law.

### 1. The Plaintiff Is Disabled

As an initial matter, the parties dispute whether the plaintiff is a qualified individual with a disability and therefore covered under the Rehabilitation Act. "To sustain a disability claim under the Rehabilitation Act, a plaintiff must as a threshold matter establish that he or she has a disability." *Klute v. Shinseki*, 840 F. Supp. 2d 209, 215 (D.D.C. 2012).

An individual is "disabled" if he or she (1) has a "physical or mental impairment that substantially limits one or more of [his or her] major life activities," (2) has "a record of such impairment," or (3) has been "regarded as having such an impairment." 42 U.S.C. § 12102(1);

29 U.S.C. § 705(20)(B); 29 C.F.R. § 1630.2(g). Prior to 2009, the Supreme Court had interpreted the definition of "disability" narrowly. *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195–98 (2002); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482–83 (1999). The requirement that a disability "substantially limit" a major life activity was to be "interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota*, 534 U.S. at 197–98. An impairment had to be "permanent or long term" and had to "prevent[ ] or severely restrict[ ] the individual" from engaging in a major life activity. *See Toyota*, 534 U.S. at 197–98.

Congress passed the ADA Amendments Act of 2008 ("ADAAA") in order to "reinstat[e] a broad scope of protection" and to "reject" the narrow interpretation of disability set forth in *Sutton* and *Toyota*. *See* Pub. L. No. 110–325, § 2(b), 122 Stat. 3553, 3554. Under the ADAAA , the definition of "disability" "shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A). New regulations promulgated to implement the ADAAA likewise provide that the term "substantially limits" is "not meant to be a demanding standard" and "shall be construed broadly in favor of expansive coverage." 29 C.F.R. § 1630.2(j)(1)(i). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* § 1630.2(j)(1)(ii). Additionally, "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting" for purposes of establishing a disability under the ADA. *See id.* § 1630.2(j)(1)(ix). The impairment need only "substantially limit[ ] the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* § 1630.2(j)(1)(ii).

The regulations likewise give guidance on cases where it "should easily be concluded" that a plaintiff is disabled, including cases where the plaintiff suffers from "major depressive disorder." 29 C.F.R. § 1630.2(j)(3)(iii). According to the regulations, a plaintiff suffering from

"major depressive disorder" is substantially limited in the major life activity of "brain function." *Id.* The defendant does not challenge the validity of the regulations and the plaintiff does not argue that the regulations are owed any deference by this Court. Since the plaintiff's claims fail regardless of the disability determination, the Court will assume, without deciding, that the plaintiff is a qualified individual with a disability as a result of her diagnosed depression.

### 2. Adverse Employment Actions

The plaintiff's Complaint identifies numerous actions taken against her by the defendant from 2007 through 2011. *See* Compl. ¶¶ 7–21. As discussed previously, however, only claims timely submitted to the EEO have been exhausted and are eligible for review in the instant action. *See Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008) ("[A] court may not consider a discrimination claim that has not been exhausted . . . ."). Accordingly, for the plaintiff's discrete discrimination claim to survive, the plaintiff must have alleged an adverse employment action in her EEO complaint. The plaintiff's First EEO Complaint alleges discrimination when her supervisor "(1) questioned/harassed [the plaintiff] about [her] use of the Family Medical Leave Act (FMLA); and (2) denied [the plaintiff's] request to work from home." *See* EEO Investigative Report, Tab 5 at 1. Thus, although the plaintiff's Complaint in this action references her placement on AWOL status, Compl. ¶ 8, her forced removal from the office building, *id.* ¶ 16, her months of administrative leave, *id.*, and her thirty days of unpaid leave, *id.* ¶ 17, she failed to exhaust her administrative remedies with respect to those actions, and they will not be considered for purposes of the plaintiff's claim of discrimination.

The same standard applies to assessing adverse employment actions under Title VII and the Rehabilitation Act. *Chambers v. Sebelius*, 6 F. Supp. 3d 118, 127 (D.D.C. 2013) (citing *Norris v. Salazar*, 885 F. Supp. 2d 402, 419–420 (D.D.C. 2012)). An "adverse employment action" is "'a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)); *see also Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003) ("[An] [a]dverse employment action . . . [entails a] tangible employment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities.").

An adverse employment action occurs if an employee "experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). "[N]ot everything that makes an employee unhappy," however, "is an actionable adverse action." *Baird*, 662 F.3d at 1250 (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). Courts have routinely recognized the difference between "purely subjective injuries," on the one hand, and "objectively tangible harm," on the other. *See, e.g., Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (internal quotation marks omitted). Since adverse employment actions must be "significant" and entail "objectively tangible harm," the Supreme Court has recognized that "in most cases [adverse employment actions] inflict[ ] direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62 (1998) (emphasis added). As a result, "[c]ourts . . . have consistently focused on 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating ... [and not] interlocutory or mediate decisions having no immediate effect upon employment conditions.'" *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997).

The plaintiff alleges that Ms. Smith "harassed" her regarding her use of FMLA, yet offers no factual support for such a conclusory allegation. Indeed, to the extent the plaintiff has

alleged any facts (as opposed to conclusions) relating to the defendant's harassment, those facts evidence only that her supervisors sought additional medical information from the plaintiff to verify her leave requests. "Generally, requests for medical information do not rise to the level of an adverse employment action." *Gordon v. U.S. Capitol Police*, 923 F. Supp. 2d 112, 117 (D.D.C. 2013) (citing *Franklin v. Potter*, 600 F. Supp. 2d 38, 70-71 (D.D.C. 2009) ("The Court finds that defendant's requests for plaintiff's updated medical information . . . were not materially adverse actions.")); *Koch v. Schapiro*, 699 F. Supp. 2d 3, 14 (D.D.C. 2010) ("Absent some tangible effect on the employee's terms and conditions of employment or other material harm, an employer's request for medical documentation for the purpose of assessing an employee's creditability or determining an appropriate accommodation is not an adverse employment action.").

The plaintiff also alleges that the defendant denied her Flexiplace application because of discrimination. Generally, "being denied the ability to work from home . . . is a minor annoyance, not an adverse action." *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 149 (D.D.C. 2010); *see also Ng v. LaHood*, 952 F. Supp. 2d 85, 96 (D.D.C. 2013); *Hunter v. Dist. of Columbia*, No. 09-01491, 2012 WL 7040239, at *4 (D.D.C. Sept. 12, 2012) ("The denial of Plaintiff's request to work at home as opposed to the office cannot be characterized as an adverse employment action."); *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 41-42 (D.D.C. 2013). Nevertheless, in *Kline v. Berry*, 404 F. App'x 505, 506-07 (D.C. Cir. 2010), the D.C. Circuit determined that a denial of a request to telecommute "could constitute an adverse employment action." Therefore, for purposes of this motion, the Court will assume, without deciding, that the denial of the plaintiff's Flexiplace application constitutes an adverse action under the Rehabilitation Act.

### 3. No Reasonable Jury Could Find that the DOE Discriminated Against the Plaintiff in Denying her Flexiplace Application

The defendant asserts that the plaintiff's Flexiplace application was denied because her application was incomplete. Since the defendant has proffered a non-discriminatory reason for the adverse employment action, the Court must "proceed to the ultimate question of discrimination *vel non,*" *Wiley v. Glassman*, 511 F.3d 151, 156 (D.C. Cir. 2007), or whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee. . . ." *Brady*, 520 F.3d at 494.

In making this evaluation of the defendant's proffered non-discriminatory reason, the Court looks to the undisputed evidence in the record submitted by the parties and the plaintiff's own allegations in the Complaint. This evidence shows that several weeks after the plaintiff submitted her Flexiplace application, Ms. Browne informed her that her application was incomplete and required more supporting medical documentation. Pl.'s Aff. at 25; Browne Aff. at 3. Additionally, Ms. Browne has averred that the plaintiff's application lacked "a plan . . . that would address any dependent care issues as outlined by the Office of Policy and International Affairs' Handbook for Flexiplace." Browne Aff. at 3. In response, the plaintiff claims that Ms. Brown had a "responsibility to address the perceived problems [with the application] with the plaintiff," Pl.'s Resp. Def.'s Statements of Facts ("Pl.'s SMF") at ¶ 31, ECF No. 14-1, and "violated the Flexiplace policy when Ms. Browne knew there was a problem with the application of [the plaintiff] and failed to raise it to her," Pl.'s SMF ¶ 33. Yet, the emails submitted by the plaintiff to the EEO demonstrate that Ms. Browne *did* respond to the plaintiff and *did* notify the plaintiff of the inadequacy of the submitted documentation. Indeed, Ms. Browne told the plaintiff on July 19, 2010 that the plaintiff's "flexiplace application is incomplete [because Ms.

Browne] did not receive supporting medical documentation." Pl.'s Aff. at 26. Ms. Browne also supplied the plaintiff with a copy of the Flexiplace policy so that she could be sure to submit all the required materials. *Id.* Additionally, although the plaintiff claims that she was denied "the option of mediation" to resolve the Flexiplace dispute, *see* Pl.'s Mem. at 10, the Flexiplace Handbook states that "[e]mployer decisions regarding Flexiplace may be appealed by filing a 'Step One' grievance," which itself "may be appealed to arbitration," *see* Flexiplace Handbook at 55. The plaintiff's own failure to appeal the Flexiplace determination is not evidence of discrimination by her employer. The plaintiff has offered nothing from which a reasonable jury could determine that the defendant's "asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee."[10] *Brady*, 520 F.3d at 494.

### C. Retaliation Claim

"To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008). The requirement of a materially adverse action in a retaliation claim "sweeps more broadly" than the adverse employment action requirement of a discrete discrimination claim. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010); *see also Baird*, 662 F.3d at 1250 (noting that "the concept of adverse action is somewhat broader" in retaliation claims); *Baloch*, 550 F.3d at 1198 n. 4 ("'Adverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim."). "[T]he anti-retaliation provision, unlike the substantive

---

[10] Additionally, although the plaintiff references a colleague's statement that the plaintiff was "targeted" because of her emotional responses, those allegations refer to actions taken by Ms. Smith in 2008 that were not exhausted by the plaintiff. *See* Rush Aff. at 2. Actions taken by a different supervisor from a different time period are not enough for a reasonable jury to discount the proffered explanation for the denial of the plaintiff's Flexiplace application.

provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006); *see also Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) ("[T]he *Burlington Northern* standard [applies] to retaliation claims under the Rehabilitation Act as well as Title VII."). Rather, "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." *Id.* at 63. Ultimately, the anti-retaliation provision "prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011) (quoting *Burlington Northern*, 548 U.S. at 68).

In determining what qualifies as a materially adverse action, the Supreme Court has provided two important guiding principles that are at times in tension with one another. The Court has made clear that "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S at 67. In this vein, the Court has said that it "speak[s] of material adversity" because "it is important to separate significant from trivial harms." *Id.* at 68. Thus, "petty slights, minor annoyances, and simple lack of good manners" cannot qualify as materially adverse actions. *Id.* The Court also has similarly emphasized that the standard of material adversity refers to "reactions of a reasonable employee" because "the provision's standard for judging harm must be objective" in order to "avoid[ ] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68–69. At the same time, however, "[g]iven the broad statutory text and the variety of workplace contexts in which retaliation may occur, [the Rehabilitation Act's] antiretaliation provision is simply not reducible

to a comprehensive set of clear rules." *Thompson*, 131 S. Ct. at 868. Instead, the Court has "phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington Northern*, 548 U.S. at 69. In other words, "an act that would be immaterial in some situations is material in others." *Id.* (internal quotation marks omitted).

The plaintiff alleges that Ms. Browne and Mr. Dixon retaliated against her for pursuing her EEO Complaint and, as noted, her First EEO Complaint contained no allegations of retaliation. Second EEO Compl. ("Both [Ms. Brown and Mr. Dixon] have continued to harass, discriminate and reprise against me, since the initial filing of my first Equal Employment Opportunity (EEO) case in early 2010."). As a result, only those factual allegations post-dating the First EEO Complaint can serve as the basis for the plaintiff's retaliation claim.

The plaintiff's Second EEO Complaint provides a litany of grievances over a span of several months following her First EEO Complaint. Specifically, the plaintiff alleges that she (1) received a letter of reprimand, (2) was approached "from behind very abruptly" by her "upset" supervisor and was asked about the status of a report in a "very harsh and angry tone," (3) was sent an email by her supervisor stating that her work assignment was "straightforward," and then contradicted the content of the email in a face-to-face meeting, (4) was placed on leave restrictions (hours after declining to mediate her dispute) because she was supposedly "absent and tardy" the prior month, (5) was denied certain leave requests, (6) was denied a union representative during a meeting to discuss the plaintiff's use of leave (and which the plaintiff believed to be a "disciplinary" meeting), (7) was asked to "walk hard copy" documents to departmental supervisors, (8) was denied a "third party neutral" during a meeting with her supervisor to discuss a work assignment, (9) was counseled by Ms. Browne regarding her use of

leave, (10) received "very rude and disrespectful" comments regarding a "brain teaser" she offered during a staff meeting, (11) failed to receive information regarding her work assignment resulting in an "extremely rough estimate of potential hires," (12) was accused of being "paid to do nothing" in a closed-door meeting, (13) received the lowest performance appraisal in the office, (14) had carts located near her office that were not removed by her supervisors, (15) was told that she was "unprofessional" in her use of the phones, and (16) was told again not to use the phones. *See* Second EEO Compl.

The bulk of the plaintiff's complaints do not warrant serious analysis but instead comprise "those petty slights or minor annoyances that often take place at work and that all employees experience" and to which "[a]n employee's decision to report discriminatory behavior [will not] immunize." *Burlington Northern,* 548 U.S. at 68. Simply put, "not everything that makes an employee unhappy is an actionable adverse action. Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001)). Such is the case here, where the plaintiff has alleged repeated confrontations regarding her use of the telephone, was requested to hand deliver documents, suffered minor public embarrassment, was provided a letter of reprimand, and had disagreements over the scope of her work assignments. *See Baloch*, 550 F.3d at 1199 (finding that letter of reprimand did not constitute materially adverse action); *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 70–71 (D.D.C. 2012) (finding that "oral reprimand," "public embarrassment," "micromanage[ment]," and other "purely subjective injuries or disagreements about management policies and decisions" did not constitute materially adverse actions). Three of the plaintiff's claims, however, do warrant closer analysis: (1) the plaintiff's

performance review; (2) the plaintiff's leave restriction; and (3) the denial of certain of the plaintiff's leave requests.

"[P]erformance reviews typically constitute adverse actions only when attached to financial harms." *Baloch*, 550 F.3d at 1199; *see also Weber v. Battista*, 494 F.3d 179, 185–86 (D.C. Cir. 2007) (holding that performance evaluations were "adverse actions insofar as they resulted in [plaintiff] losing a financial award or an award of leave"); *see also Francis v. Perez*, 970 F. Supp. 2d 48, 63 (D.D.C. 2013) *aff'd*, 2014 WL 3013727 (D.C. Cir. May 16, 2014). The plaintiff has put forward no allegations or facts in the record to indicate that her performance review, which stated that she "met expectations," resulted in any financial harm. Thus, her performance evaluation does not rise to the level of a materially adverse employment action sufficient to support her retaliation claim.

Although the plaintiff's Second EEO Complaint alleges that she was placed on "leave restriction," she does not provide any context regarding the restriction or any evidence to conclude that it would have dissuaded a reasonable employee from pursuing an EEO claim, as required. *See Burlington Northern*, 548 U.S. at 68. For example, in *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 98 (D.D.C. 2011), the plaintiff argued that a leave restriction was imposed in retaliation for filing an EEO complaint. The court rejected the plaintiff's claim because the plaintiff "fail[ed] to articulate any basis from which the Court may conclude that [the leave restriction] either affected the terms or conditions of her employment or would have dissuaded a reasonable employee from pursuing an EEO claim." *Id.*; s*ee also Baloch*, 550 F.3d at 1199 (D.C. Cir. 2008) (holding that "sick leave restriction[] requiring that a physician certify the problem and date of treatment each time [the plaintiff] submitted a leave request" was not a materially adverse action). The plaintiff may indeed have felt constrained by the leave

restrictions, but "[t]he fact that the restrictions imposed a negligible burden on the plaintiff's employment conditions mitigate any deterrent effect a reasonable employee would ascribe to them." *Baloch v. Norton*, 517 F. Supp. 2d 345, 356 (D.D.C. 2007), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008). The plaintiff has presented no evidence to indicate the type of leave restriction, the duration of the leave restriction, or any costs imposed by the leave restriction. Accordingly, the plaintiff's leave restriction does not qualify as a materially adverse action sufficient to sustain a claim for retaliation.

Finally, the plaintiff presents evidence that on three occasions her requests for leave approval were denied. Specifically, the plaintiff's January 20, 2011 request for several hours of administrative leave due to elevated blood pressure was denied; her February 1, 2011 request for thirty minutes of Leave Without Pay was denied; and her January 26, 2011 request for 2.75 hours of administrative leave was denied.[11] *See* Second EEO Compl. The plaintiff has not, however, alleged any financial harm resulting from these denials. *See Morales v. Gotbaum*, No 10-cv-221, 2014 WL 2031244, at *19 (D.D.C. May 19, 2014) ("Although some courts in this district have found a denial of advanced sick leave to be an adverse action, those cases involved either a signification period of time—three to four weeks of sick leave—or a showing of financial harm from the denial." (internal citations omitted)). Moreover, any harm suffered by the plaintiff as a result of the denial of a few hours of administrative leave was *de minimis* and, consequently, not material. *See id.; see also Dorns v. Geithner*, 692 F. Supp. 2d 119, 134 (D.D.C. 2010) ("[E]ven assuming that the denial of advanced sick leave is actionable, the amount in question here is too *de minimis* to be considered 'material' or 'significant.'"). As such, the plaintiff's denial of leave does not qualify as a material adverse action.

---

[11] It is unclear from the plaintiff's EEO Complaint whether the January 26, 2011 final leave request was subsequently approved once she provided evidence that her son's school was delayed. *See* Second EEO Compl. at 5.

Moreover, even assuming that the plaintiff's leave restrictions and leave denials could constitute a materially adverse action, no reasonable jury could find that the denied leave was in retaliation for the plaintiff filing the First EEO Complaint six months earlier.[12]  The plaintiff has offered no facts in support of her contention that the denial was the result of retaliation, let alone sufficient facts from which a reasonable jury could find that the denied leave requests were the result of retaliation.  *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (finding "an inference of retaliatory motive based upon the 'mere proximity' in time between [the plaintiff's] filing her first suit and the AWOL listing two and one-half months later" to be "untenable").  Nor can the plaintiff bootstrap the other incidents referenced in the Second EEO Complaint into her retaliation claim, as such incidents "do not amount to the 'pattern of antagonism' required for a reasonable jury to infer . . . retaliat[ion] . . . ." *Id.* at 1323.  Rather, the other grievances discussed by the plaintiff amount only to "petty slights."  *Id.*  Finally, although the plaintiff notes that her timekeeper, Marlisa Cornitcher submitted an affidavit stating that "[c]omplainant is accurate when she puts in her leave and is accurate and very detailed when it comes to her timesheets and recording her time," Aff. of Marlisa Cornitcher, ROI Ex. 13, at 2, the affidavit was submitted to the EEO on November 23, 2010, or two months prior to the January 2011 leave denials.  The affiant has no knowledge regarding the details of the plaintiff's subsequent leave requests and, with respect to the plaintiff's prior leave requests, the record indicates that Ms. Browne approved every single request.[13]  *See* ROI ex. 14.  There is simply nothing in the record on which a jury could base a finding of retaliation.

_____

[12] The plaintiff filed her First EEO Complaint in July 2010, but the alleged denials of leave occurred in January and February 2011.  Even the EEO Investigative Report was completed on December 13, 2010, or more than a month prior to the alleged incidents.

[13] Indeed, the investigative report from the First EEO Complaint shows that the plaintiff took approved leave on January 11, 2010, January 22, 2010, January 27, 2010, January 28, 2010, March 3, 2010, March 17, 2010, March 18, 2010, March 19, 2010, March 23, 2010, March 24, 2010, May 13, 2010, May 20, 2010, May 24, 2010, May 25, 2010, May 26, 2010, May 27, 2010, May 28, 2010, May 31, 2010, June 1, 2010, June 2, 2010, June 3, 2010, June 4,

### D.        Hostile Work Environment Claim

In the employment discrimination context, a work environment is considered "hostile" when it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)); *Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013); *Baloch*, 550 F.3d at 1201.   "The key terms, then, are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment." *Jones v. GlaxoSmithKline, LLC*, 755 F. Supp. 2d 138, 149 (D.D.C. 2010) (quoting *Lester v. Natsios*, 290 F.Supp. 2d 11, 22 (D.D.C. 2003)); *see also Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188–89 (D.D.C. 2012); *Turner v. Shinseki*, 824 F. Supp. 2d 99, 123–24 (D.D.C. 2011); *Dorns v. Geithner*, 692 F. Supp. 2d 119, 135–36 (D.D.C.2010) (citing *Hendricks v. Paulson*, 520 F. Supp. 2d 65, 89 (D.D.C.2007)); *Roberson v. Snow*, 404 F. Supp. 2d 79, 89–90 (D.D.C. 2005).

To determine whether a work environment is sufficiently "hostile" to support a claim, the Court must look at the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "[C]onduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The standard is demanding to ensure that the anti-discrimination laws do not become a "general civility code" for the workplace.  *See Faragher*, 524 U.S. at 788 (quoting *Oncale*, 523 U.S. at 80)

---

2010, June 7, 2010, June 8, 2010, June 9, 2010, June 10, 2010, June 11, 2010, June 14, 2010, June 15, 2010, June 16, 2010, June 17, 2010, June 18, 2010, June 28, 2010, July 8, 2010, July 16, 2010, and July 20, 2010.  *See* ROI Ex. 14.

As an initial matter, even assuming the plaintiff exhausted her hostile work environment claim, not every potential incident of discrimination over the course of her employment can be considered in evaluating her claim. Under *National Rail Road Passenger Corporation v. Morgan*, 536 U.S. 101, 118 (2002), if "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." "The *Morgan* principle is not, however, an open sesame to recovery for time-barred violations." *Baird*, 662 F.3d at 1251. A time-barred incident "can qualify as 'part of the same actionable hostile environment claim' only if [it is] adequately linked into a coherent hostile environment claim." *Id.* The D.C. Circuit has explained that *Morgan* requires an inquiry into whether the time-barred incidents "'involve[] the same type of employment actions, occur[] relatively frequently, and [are] perpetrated by the same managers'" as the timely-filed incidents. *Id.* (alterations in original) (quoting *Morgan*, 536 U.S. at 120–21). Likewise, where a time-barred incident "had no relation to the [timely-filed] acts . . . or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim," such an incident need not be considered. *Id.* (internal quotations omitted). The D.C. Circuit also cited approvingly to *Wilkie v. Department of Health & Human Services*., 638 F.3d 944, 951 (8th Cir. 2011), for the proposition that a court should examine the "nature, frequency, and severity" of the time-barred incidents. *Baird*, 662 F.3d at 1251.

Applying these principals to the instant case, the plaintiff may not invoke the incidents described in her Complaint from 2007–2008 in support of her hostile work environment claim. Therefore, although the plaintiff's Complaint references her placement on AWOL status, Compl. ¶ 8, her forced removal from the office building, *id.* ¶ 16, her months of administrative leave, *id.*, and her thirty days of unpaid leave, *id.* ¶ 17, those incidents will not be considered in evaluating

the plaintiff's hostile work environment claim. Those events occurred in 2007 and 2008, a full two years prior to the hostile work events alleged in the plaintiff's Second EEO Complaint; occurred under the direction of a different supervisor, since Ms. Browne succeeded Ms. Smith in 2010; and represent wholly different types of employment actions from the grievances described in the plaintiff's Second EEO Complaint. Thus, such claims did not "occur frequently," were not the same "type of employment action[]" and were not "perpetrated by the same managers." *Baird*, 662 F.3d at 1251.

While the plaintiff's work environment was, from her perspective, "hardly ideal" and "her relationship with her supervisor was strained," her hostile environment allegations boils down to "complaints based on a lack of communication with her supervisor, the handling of her sick leave, and an unsatisfactory performance evaluation." *Williams v. Spencer*, 883 F. Supp. 2d 165, 181 (D.D.C. 2012). Such "common workplace challenges do not show an environment so pervaded with discriminatory abuse as to alter the conditions of plaintiff's employment." *Id.*; *see also Hussain v. Nicholson*, 435 F.3d 359, 366–67 (D.C. Cir. 2006) (affirming summary judgment for defendant on hostile work environment claim because no reasonable jury could find a hostile work environment based on a denial of promotion, denial of medical leave, poor performance evaluations, and threats of termination); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 93–94 (D.D.C. 2009) (finding insufficient allegations for a hostile work environment claim when plaintiff alleged that "management passed him over for performance awards, lowered his performance evaluations, unfairly reprimanded and criticized him, made disparaging remarks about his EEO complaints, closely scrutinized his work, refused him a window cubicle, removed some of his duties, . . . denied his requests to travel or otherwise failed to provide support for his work with staffing and funding [, . . .] den[ied] a noncompetitive promotion, den[ied] a within-

grade increase, and oppos[ed] his transfer to another office or detail assignment"). The plaintiff's hostile work environment claim fails because the incidents she identifies do not demonstrate a work environment so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale*, 523 U.S. at 78.

## IV.    CONCLUSION

The Court holds that the plaintiff's voluntary withdrawal from the administrative process following more than 180-days of good-faith compliance with the EEO investigation does not preclude a finding that the plaintiff exhausted her administrative remedies. Nonetheless, the Court finds that the plaintiff failed to exhaust her remedies for all discrete discriminatory incidents prior to March 23, 2010 and failed to exhaust her administrative remedies for her retaliation and hostile work environment claims in their entirety. Further, the Court assumes, without deciding, that the plaintiff qualifies for the protections of the Rehabilitation Act and holds that the plaintiff did not suffer an adverse employment action when the defendant made inquiries into her leave requests and that no reasonable jury could find that the defendant discriminated against the plaintiff in denying her Flexiplace application. Finally, even if the plaintiff had exhausted her administrative remedies with respect to her retaliation and hostile work environment claims, the conduct described in the Second EEO Complaint does not amount to retaliation or a hostile work environment.

For the reasons stated above, the defendant's motion for summary judgment is granted.

An appropriate Order accompanies this Memorandum Opinion.


Date: November 6, 2014

_____
BERYL A. HOWELL
United States District Judge